Grant Cartwright
Smith & Smith, PLLC
6720 E. Camino Principal
Tucson, AZ 85715

✓ FILED ____ LODGED
____ RECEIVED ____ COPY

OCT 19 2015

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ P DEPUTY

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

CV-15-2092-PHX-ESW

| | |
|---|---|
| UNITED STATES OF AMERICA, | Civ. Action No. _____ |
| *ex rel*. DR. ROBERT ELLIS and DR. THOMAS SCHMIDT, | **QUI TAM COMPLAINT** |
| Plaintiffs, | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)2**  |
| v. | |
| UNIVERSITY OF PHOENIX, APOLLO EDUCATION GROUP, INC. and DOES 1-100, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## COMPLAINT

On behalf of the United States of America, Relators Dr. Robert Ellis and Dr. Thomas Schmidt file this *qui tam* Complaint against Defendant University of Phoenix, Defendant Apollo Education Group, Inc., and Does 1-100 (individually, or collectively "UOP" or "Defendants"), and allege as follows:

## INTRODUCTION

1.      This is an action to recover treble damages and civil penalties on behalf of the United States of America in connection with a scheme designed to manipulate government education funding programs in order to fraudulently obtain funds from the United States Department of Education pursuant to the Higher Education Act, Title IV ("HEA"), from at least 2004 continually through the present in violation of these programs' requirements and

regulations and in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended (the "FCA").

2.    UOP  is the largest proprietary, for profit, undergraduate educational institution in the United States with over 100 locations across the country and hundreds of thousands of students.    Since its founding in 1976, UOP has generated billions of dollars in revenues through tuition payments by its students.  Approximately 90% of these revenues are paid directly by the Federal Government through Title IV funding under the Department of Education ("DOE").

3.    As an express condition of receiving Title IV federal funds, UOP must meet certain eligibility requirements under federal law and agree to be bound by a Program Participating Agreement ("PPA").  Among other things, under the PPA, UOP agreed to comply with state licensing requirements.

4.    Since its founding, UOP has built its brand around "working adults" seeking to obtain an undergraduate degree while balancing the "demands of work, family, and community." In targeting these "working adults," UOP's marketing emphasized a "flexible" curriculum driven by a "fast paced, accelerated program" that allows its students to earn the equivalent credit hours of a full-time undergraduate university.

5.    While UOP's program makes good on its promise of flexibility, its structure fails to provide what should be the institution's primary function – to provide students with a quality education and prepare them for a successful, and rewarding career after graduation.  UOP's unyielding loyalty to this brand, and its obsessive commitment to maintain enrollment by making its curriculum as easy and convenient as possible for students, caused it to violate numerous federal and state education laws through knowing and intentional education fraud.

6.      From at least 2004-present, UOP has knowingly and intentionally violated New Jersey state licensing laws requiring UOP to provide a minimum of 37.5 hours of face-to-face instructional time to students for each three credit course.  UOP's normal three credit courses, offered over a five week period with 4 hour classes each week, total just 20 hours of face-to-face instructional time, well below the 37.5 hours required by the State.

7.      UOP has circumvented the New Jersey requirements, and avoided regulators, by creating sham programs known as "Learning Teams" which are promoted as 4.5 hour lectures running for four of the five weeks during each course.  UOP regularly represents to New Jersey that its Learning Teams make up the remaining 17.5 hours of instructional time.

8.      In reality, the Learning Teams are nothing more than a study hall constructed as a ruse to avoid regulator scrutiny, and give the impression that UOP complies with federal and state law.  UOP officials constructed generic lectures to be given at the study halls to create the impression that face-to-face instruction was actually taking place.  However, students are not required to attend (and rarely do), the generic instruction is rarely, if ever, given, and students who do attend use the time to complete projects, do homework, or browse the internet.

9.      In order to avoid detection, Learning Team proctors were instructed to falsify attendance records to show that lectures were given and students attended.  Indeed, the New Jersey campus facilities often could not even accommodate the Learning Teams, which UOP falsely certified it had been giving, based on its physical campus enrollment.

10.      As a result of this fraudulent practice, UOP was, and continues to be, able to defraud the Government for billions of dollars to the great detriment of its students who are ill-equipped to face the rigors of the already difficult job world following a mediocre education under the UOP program.

11.     By violating these state laws, UOP has violated the terms of its PPA with the Government. Each year that UOP induced the Government to disburse federal student aid, it did so under false pretenses, knowing that it was and would continue to violate New Jersey's state instructional time requirements. The violation of the PPA is a violation of the FCA.

12.     Additionally, UOP has a completion rate far below that which is required under federal law to be eligible for federal funds under the government student aid programs. UOP regularly recruited and admitted students incapable of completing the program. This churning of student admissions resulted in a substantial volume of individuals who will never be able to pay back their student loans. As a result of the mass defaulting of these government insured student loans, the Government has lost hundreds of millions of dollars as well.

13.     While working at UOP, Relators Dr. Thomas Schmidt and Dr. Robert Ellis, former UOP-Jersey City, New Jersey campus Professors,  personally observed numerous unlawful and fraudulent practices implemented by Defendants to defraud the Government and violate the terms of its PPA. UOP's violations come at great cost to the Government, ultimately responsible for defaulted loans and directly responsible for interest in the case of subsidized loans. In addition to the significant financial impact UOP's conduct had on the Government, UOP's students suffered as well, incurring significant personal debt to attend a school which did not meet minimal educational requirements nor adequately prepare them for gainful employment.

14.     As a result of these practices, UOP should have been disqualified from the federal loan program from the date it agreed to the PPA knowing that it would never mandate attendance at the Learning Teams, as mandated by the New Jersey instructional hours requirement.

15.     UOP's continued evasive and fraudul_nt conduct continues to violate state and federal law, and its continued certificaticns of ccmpliance violate the FCA.  As a result, the federal government has been damaged in an amount equal to the ill-gotten gains collected as a result of being part of the federal aid program, amounting to several billion dollars.

## PARTIES

**A.**     **Defendants**

16.     Defendant UOP is one of the nation's largest proprietary, for-profit, higher education institutions that provides online and in-person instruction for associate, bachelor's, masters, doctoral, and certificate programs.  UOP is wholly owned by the corporation Apollo Education Group.  UOP is headquartered in Phoenix, Arizona and maintains six campuses within Arizona.  UOP also maintains campuses across the United States as well as an online program.

17.     Defendant Apollo Education Group, Inc. is a publicly traded corporation headquartered in Phoenix, AZ which owns several for-profit educational institutions, including Defendant UOP.

18.     Relators are unaware of the true names of certain defendants sued herein under the fictitious names Does 1-100, and will seek leave to amend this complaint to sue such parties by their actual names at such time as plaintiffs become aware of them.

**B.**     **Relators**

19.     Relator Thomas Schmidt is a citizen of the United States of America and is a resident of Yonkers in the State of New York.  He was employed by UOP as a College Campus Chairman for the Jersey City Campus from 2004 through 2011.

20.     Relator Robert Ellis is a citizen of the United States of America and is a resident of Hackensack in the State of New Jersey.  He was employed by UOP as an instructor for ten years between 2005 and 2015.

## JURISDICTION A D VENUE

21.     This Court has jurisdic o over t! e subject matter of this False Claims Act action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3 2(a), which confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

22.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by section 3729 occurred." Section 3732(a) also authorizes nationwide service of process. During the time period relevant to this Complaint, Defendants resided and transacted business in the District of Arizona, and most of the violations of 31 U.S.C. § 3729 described herein were the direct result of actions which occurred within and at the direction of Defendants' employees and representatives within this judicial district.

23.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because each of the Defendants can be found in, reside in, and transact business in the District of Arizona and many of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

24.     In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed *in camera* and will remain under seal for a period of at least 60 days and shall not be served on the Defendants until the Court so orders.

25.     Pursuant to 31 U.S.C. § 3730(b)(2), the Relator must provide the Government with a copy of the Complaint and/or a written disclosure of substantially all material evidence and material information in their possession contemporaneous with the filing of the Complaint. Relator has complied with this provision by serving copies of this Complaint upon the Honorable

John S. Leonardo, United States Attorney for the District of Arizona, and upon the Honorable

Loretta E. Lynch, Attorney General of the United States.

## GOVERNING LAWS, REGULATIONS AND CODES OF CONDUCT

### A.    The False Claims Act

26.    Originally enacted in 1863, the FCA was substantially amended in 1986 by the

False Claims Amendments Act.  The 1986 amendments enhanced the Government's ability to

recover losses sustained as a result of fraud against the United States.  Further clarifying

amendments were adopted in May 2009 and March 2010.

27.    The FCA imposes liability upon any person who "knowingly presents, or causes

to be presented [to the Government] a false or fraudulent claim for payment or approval"; or

"knowingly makes, uses or causes to be made or used, a false record or statement material to a

false or fraudulent claim"; or "knowingly makes, uses, or causes to be made or used, a false

record or statement material to an obligation to pay or transmit money or property to the

Government, or knowingly conceals or knowingly and improperly avoids or decreases an

obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(A),

(B), (G) (emphasis added).  Any person found to have violated these provisions is liable for a

civil penalty of up to $11,000 for each such false or fraudulent claim, plus three times the

amount of the damages sustained by the Government.

28.    Significantly, the FCA imposes liability where the conduct is merely "in reckless

disregard of the truth or falsity of the information" and further clarifies that "no proof of specific

intent to defraud is required." 31 U.S.C. § 3729(b)(1).

29.    The FCA also broadly defines a "claim" as one that includes "any request or

demand, whether under a contract or otherwise, for money or property and whether or not the

United States has title to the money or property, that – (i) is presented to an officer, employee, or

agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money

or property is to be spent or used on the Government's behalf or to advance a Government

program or interest, and if the United States Government – (i) provides or has provided any

portion of the money or property requested or demanded; or (ii) will reimburse such contractor,

grantee, or other recipient for any portion of the money or property which is requested or

demanded." 31 U.S.C. § 3729(b)(2)(A).

30.     The FCA empowers private persons having information regarding a false or

fraudulent claim against the Government to bring an action on behalf of the Government and to

share in any recovery.  The complaint must be filed under seal without service on any

Defendants.  The complaint remains under seal while the Government conducts an investigation

of the allegations in the complaint and determines whether to intervene in the action. 31 U.S.C. §

3730(b).

31.     In this action, UOP knowingly and routinely requested Government funds and

falsely certified compliance with federal and New Jersey regulations by falsifying, manipulating,

and/or misrepresenting or causing to be misrepresented the true requirements of its academic

program and the number of instructional hours provided.  As a result of this illegal conduct, UOP

caused hundreds of millions of dollars to be granted and loaned to its students from the

Department of Education and/or guaranteed by the Government.

**B.      Title IV of the Higher Education Act**

32.     The Higher Education Act ("HEA")  was signed into law in 1965 and has since

been reauthorized and amended multiple times.

33.     Title IV of the HEA governs financial assistance to students. 20 U.S.C. §§ 1070,

et seq.

34.     For many years, for-profit institutions were not eligible for aid under Title IV

programs.  Congress amended the HEA in 1972 to extend federal aid to for-profit schools.

35.     Presently, public, private, proprietary, and foreign educational institutions are

eligible to participate in Title IV funding programs.

36.     When an educational facility wishes to receive federal subsidies under Title IV, it

must seek certification from the DOE.

37.     If the DOE grants certification, an educational institution must enter into a PPA

with the DOE, in which it agrees to abide by applicable statutory, regulatory, and contractual

requirements.

38.     A for-profit institution must offer programs which prepare students for "gainful

employment in a recognized occupation."  20 U.S.C. § 1002(b)(1).

39.     If an eligible institution engages in "substantial misrepresentation of the nature of

its education program, its financial charges, and employability of its graduates, the Secretary

may impose a civil penalty" of up to $25,000 for each violation or misrepresentation.  20 U.S.C.

§ 1094(c)(3)(B).

C.      **Federal Regulations**

40.     To be eligible to participate in the Federal Student Aid ("FSA") programs, an

institutions must be legally authorized by the state in which it provides a program to provide that

program.  34 CFR 600.4(a)(1).

41.     The federal regulations provide:

*Credit hour:* Except as provided in 34 CFR 668.8(k) and (l), a credit hour is an amount of
work represented in intended learning outcomes and verified by evidence of student
achievement that is an institutionally established equivalency that reasonably
approximates not less than—(1) One hour of classroom or direct faculty instruction and a
minimum of two hours of out of class student work each week for approximately fifteen
weeks for one semester or trimester hour of credit, or ten to twelve weeks for one quarter
hour of credit, or the equivalent amount of work over a different amount of time; or

9

(2) At least an equivalent amount of work as required in paragraph (1) of this definition for other academic activities as established by the institution including laboratory work, internships, practica, studio work, and other academic work leading to the award of credit hours.

34 CFR 600.2.

42.    A proprietary institution must also meet certain requirements regarding the programs offered and instructional time and provide training that prepares a student for "gainful employment in a recognized occupation." 34 CFR 668.8(d), (k), (l). For example, the eligibility rules requires certain proprietary institutions of higher education to provide 37.5 clock hours of instruction per semester hour. 34 CFR 668.8(l).

43.    To participate in Title IV aid programs, an institution must enter into a PPA with the DOE and agree that "it will comply with all statutory provisions of or applicable to Title IV of the HEA" and applicable regulations prescribed under Title IV. 34 CFR 668.14(a)(1) and (b)(1).

44.    Continued participation in Title IV programs is conditioned on continued compliance. 34 CFR 668.14(a)(1).

45.    A "[m]isrepresentation concerning the nature of an eligible institution's educational program includes, but is not limited to, false, erroneous or misleading statements concerning" any of the following:

- "[t]he availability, frequency, and appropriateness of its courses and programs to the employment objectives that it states its programs are designed to meet";

- "[t]he nature and availability of any tutorial or specialized instruction, guidance and counseling, or other supplementary assistance it will provide its students before, during or after the completion of a course"

- "Whether the academic, professional, or occupational degree that the institution will confer upon completion of the course of study has been authorized by the appropriate State educational agency. This type of misrepresentation includes, in the case of a degree that has not been authorized by the appropriate State educational agency or that requires specialized accreditation, any failure by an eligible institution to disclose these facts in any advertising or promotional materials that reference such degree" 34 CFR 668.72(g), (k), (n).

46.     In what is referred to as the 90/10 rule, a school must receive at least 10% of its revenue from non-Title IV sources. 34 C.F.R. § 668.28(a).  Non-Title IV sources include veteran's benefits, job training grants, or loans from the institution itself.

47.     For purposes of Direct Loan and FFEL programs, an institution only qualifies if it substantiated completion and placement rates are at least 70 percent. 34 CFR 668.8(e)(i) and (ii).

48.     Proprietary institutions are required to calculate completion and placement rates using methods set forth in the applicable regulations. 34 CFR 668.8(f) and (g).

**D.     <u>State Regulations</u>**

49.     Under New Jersey regulations, an educational institution must provide 50 minutes of "face to face class activity each week for 15 weeks", for each credit-hour per semester, which is the equivalent of 37.5 hours for a three-credit course. *See* N.J.A.C. 9A:1-1.2.

50.     "[L]ibrary, independent study, laboratory, or physical education activities" do not count toward semester credit hours. N.J.A.C. 9A:1-2.1(c).

<u>**SPECIFIC ALLEGATIONS**</u>

51.     UOP was founded in 1976.  It is a for-profit company which is geared toward providing educational services to full-time working adults.  Presently, UOP has almost 100 campuses and learning centers in addition to its vast online program.

52.     Defendant UOP receives well over half a billion dollars annually from the United States DOE through direct loans.  Per the FSA office of the DOE, for the 2014-2015 fiscal year alone as of June 30, 2015, UOP received  $503,919,186.00 in unsubsidized direct undergraduate loans and  $373,725,576.00  in subsidized direct loans.[1]  In addition, Defendant UOP received $106,015,767  in Federal Pell Grants for the 2014-2015 fiscal year as of June 30, 2015.[2]

53.     As a public company, Apollo has a duty to its shareholders to monitor profitability and enrollment levels.  In furtherance of these efforts, Defendant UOP carefully tailors its marketing with a "Key Message Matrix" to rebut critics and promote its brand.  A central component of UOP's marketing message to drive enrollment is that it offers an accelerated program and flexibility.  Defendant UOP's courses only meet for 20 hours total, amounting to four-hour sessions over a five week period, whereas traditional universities and community colleges meet for twelve week courses which are approximately 40 hours.

54.     In addition, the curriculum and course syllabi are designed at headquarters in Phoenix, Arizona, and focus on a structure that is as convenient for students as possible.  For example, while instructors are given some latitude to modify this curriculum, students are typically graded on class participation and group projects rather than tests or other examinations. In New Jersey, as confirmed by UOP in its licensing application to the State, UOP students are not required to take any tests or examinations.

**A.     UOP Was Under Pressure to Enter the New Jersey Market**

55.     During the advancement of online undergraduate programs, the federal government imposed a "one-to-one" ratio requirement mandating that online universities maintain enrollment at brick and mortar campuses at the same levels as its online program.  Due

---

[1] *Title IV Volume Reports*, FEDERAL STUDENT AID, https://studentaid.ed.gov/sa/about/data-center/student/title-iv (last visited October 16, 2015).
[2] *Id.*

to the pressure of maintaining high enrollment levels for its very profitable online program, Defendants aggressively pushed to establish brick and mortar campuses in as many states as possible in order to maintain its profitable online business.

56.     To be eligible to participate in FSA programs, a proprietary institution must be legally authorized by the state in which it provides a program to provide that program.  34 CFR 600.4(a)(1).  Having established physical campus locations in numerous states already, UOP focused on New Jersey despite its rigid eligibility requirements due to its high concentration of potential UOP students and its close proximity to New York City.

57.     Initially, in 1998, Defendants sought approval from the State of New Jersey but were rejected.   At only twenty cumulative hours of course instruction, UOP's program fell significantly short of the required 50 minutes of "face to face class activity each week for 15 weeks", which is the equivalent of  37.5 hours required under New Jersey regulations.  *See* N.J.A.C. 9A:1-1.2.

58.     In or around 2000, Defendants came under fire from the DOE because an audit found that it impermissibly included Learning Team meetings – a non-mandatory study hall designed to allow students to congregate and work on group projects – as instructional hours, among other things.  UOP's parent, the Apollo Group, settled with the DOE and agreed to pay $6 million to settle charges in March, 2000.  At all UOP locations, the school continued to offer Learning Team meetings.

59.     Under New Jersey Regulations, however, "library, independent study, laboratory, or physical education activities" do not count toward semester credit hours.  N.J.A.C. 9A:1-2.1(c).  As a result, UOP devised a scheme to circumvent New Jersey's course instruction requirements.

**B.**     **Revamped Learning Teams Were the Linchpin of New Jersey Approval**

60.     As referenced above, Defendant UOP's condensed courses consist of only four hours of instruction over five weeks, totaling a mere twenty hours; however, under the New Jersey Regulations, a three credit course must consist of 50 minutes of "face to face class activity each week for 15 weeks," which is the equivalent of 37.5 hours required under New Jersey regulations. *See* N.J.A.C. 9A:1-1.2.

61.     Accordingly, UOP headquarters, desperate to take advantage of the potential crop of students in order to increase online enrollment, devised a plan to get around these requirements by implementing revised Learning Teams to make up the difference between what the New Jersey regulations require and what UOP actually provided in instruction.

62.     Through these Learning Teams, students are supposed to meet for 4-5 hour sessions over four weeks of the course and cover generic topics (completely unrelated to their course work) such as basic writing, creativity in problem solving, online collaboration, effective goal setting strategies, stress management, and diversity in teams.

63.     UOP submitted an additional proposal to operate in New Jersey in 2001, which contained increased general education, full access to the library of New Jersey City University, and transformed Learning Teams. That proposal was approved and UOP opened a Jersey City, New Jersey campus in 2004.

64.     UOP officials from Phoenix, Arizona developed a book of instructional modules for Learning Team students, with modules on lessons that included file organization and working well in groups. Relator Schmidt served as a member of Learning Teams full-time faculty and was involved in the development of Interdisciplinary Learning Team Seminar materials and curriculum for faculty to follow, which provided guidance on components of the program such as "Building a Climate for Collaboration."

C.    **Defendants' Fraudulent Practices Regarding New Jersey Learning Teams**

65.    From the start, Defendants' purported compliance with New Jersey's requirements, which go to the core of the education UOP purportedly provides, has been a sham. For example, even though Defendant UOP's licensure was conditioned on sufficient access to library facilities, few, if any, students from the Defendant UOP's Jersey City campus have ever been to the library.[3]

66.    Further, per the applicable regulations and licensure requirements, Learning Teams must be instructor led.  The UOP faculty policy statement, which is distributed to students states:

"New Jersey regulations require that Learning Teams time be a formal part of each student's schedule.  During each week of the course, except for the final week, a Learning Team meeting will be scheduled to provide an opportunity to meet with your Learning Team and receive instruction from a University faculty member.  These instructor led sessions are designed to complement your classroom activities."

67.    The policy statement also provides: "Some examples of the types of activities that may occur are: case study analysis and presentation, facilitation of small group breakout, facilitation of large group discussion, debate, and formal question and answer sessions."

68.    UOP materials provided to students at enrollment and during classes acknowledge that Learning Team sessions "are part of the University's compliance requirements with the Commission of Higher Education's interpretation of their regulations for state licensed institutions in New Jersey."

69.    In reality, UOP never intended to comply with the instructional hours requirement.

---

[3] In fact, students and faculty are actively discouraged from using the library facility to which they purportedly have access.  In or around 2012, Relator Ellis attempted to organize a class trip to the library for the benefit of his students but was met with significant opposition from the administration and prohibited from doing so.

70.    For the first few years of the New Jersey campus, UOP feigned legitimate instructional hours through the Learning Teams by organizing lectures and asking proctors to speak for 10 minutes about the given generic topic.  Some lecturers actually followed this still-non-compliant model, reading from a power point for 10 minutes while small groups of students continued with their projects.   In response to an email from UOP's Area Chair explaining that students noticed that "no one is running" Learning Teams, Relator Schmidt explained that students "come and go freely" and that "[t]here is no grade-bearing component offered at learning teams."  Rather, the proctor presents a lesson and "should be able to assist with current assignments in the course."  In reality, students were only responsible for turning in assignments, not attending or participating in the purported instructional hour lectures themselves.

71.    In or around 2004, administrators recognized that students routinely complained about Learning Teams.  Many complained about the distraction the lectures caused.  Others complained that Academic Counselors and Advisors (UOP recruiters) did not inform students that Learning Teams were part of the curriculum, creating a commitment of two nights a week, as opposed to just one like students were told (a misconception which was corrected as the Learning Teams were not mandatory).  As a result, UOP eliminated the lectures altogether, but continued to affirmatively deceive the State by  representing that lectures were being given.

72.    Further, UOP did not require students to meet or attend Learning Teams (whether lectures were given or not) at all.  Rather, unlike traditional classroom instructional hours which are mandatory, students are not required to attend Learning Team sessions and UOP maintains no documentation which would demonstrate whether or not students do *actually* attend.  Indeed, Professors are specifically told that they cannot tell students that the Learning Teams are

mandatory, but they also, for compliance purposes, cannot tell students that the lectures are *not* mandatory.

73.    Notably, while professors are required to maintain attendance rosters for classes and missing two classes will result in the students' automatic withdrawal from that course, there is no attendance requirement for Learning Teams.  Instead, UOP materials specifically explain that missing the meetings and not participating "will not result in an automatic withdrawal from class but will demonstrate your lack of participation in the team assignments and will, in many cases, have a negative effect on your grade." In their entire careers at UOP, neither Relator Schmidt nor Relator Ellis has ever penalized or heard of a student being penalized for failing to attend the Learning Teams.

74.    UOP administrators, including the Northeast Regional Director of Academic Affairs directed faculty to be sure to refrain from instructing students that Learning Teams are mandatory: "Fox [sic] example, one instructor has in her syllabus that LT are mandatory and that students will be withdrawn if they miss more than one.  (Tom and I have talked with her and her class and have taken care of this but we can't have this happening.)  One student actually dropped out of school over the LT issue. . . ."

75.    To circumvent the New Jersey requirements, and avoid detection by state regulators, UOP required Learning Team proctors to falsify attendance records to indicate that a lecture was given which never occurred, and could not have occurred because students never actually attended.

76.    In or about 2011, Relator Ellis turned in an accurately completed form which reflected that no students attended and no lecture had been given.  Richard Dunn, a member of Defendant UOP's Jersey City campus administration informed Relator Ellis that if he wanted to

get paid, he had to falsify the relevant form and should just "pick any module" to record on the form as taught.

77.      Relator Ellis conducted Learning Team sessions approximately fifteen times. Throughout his time conducting Learning Teams, Relator Ellis personally observed that not a single student stayed more than 15-30 minutes per week, if any students showed up at all.  Nor are either Relator aware of any student ever showing up and staying for the entire session. Indeed, Relator Ellis never proctored a single Learning Team Seminar at which a student attended for a Learning Team lecture.  Any students that did attend, or were present, did so to do their homework, or work on their Learning Team group project.

78.      Nevertheless, Relator Ellis attempted to assist students with assignments and provide instruction while he was on Learning Team duty in the student center, but was frequently chastised for doing so by students as it distracted from homework and group assignments.

79.      In around 2012, UOP significantly downsized its campuses.  Subsequently, in April of 2015, Defendants sought to eliminate Learning Teams in other states, but was aware that New Jersey required the equivalent of 25-30 points, approximately a total of 20 hours of activities for the students, in order to be in compliance.

80.      Miriam Frolow, New Jersey Director of Academic Affairs for the Jersey City campus, instructed Relator Ellis that although overall university policy changed, the New Jersey campus had to maintain its sham Learning Teams, stating that "we need to keep doing what we have been doing, even though the approach to Learning Teams has changed."

81.      Despite this concession, and UOP's continued intentional failure to meet the state licensing requirements, UOP seeks and obtains federal funds annually, while knowingly failing

to comply with the express condition of the PPA - a prerequisite of eligibility for Title IV funds. *See also* 34 CFR Part 668.

82.    As a result of this conduct, UOP has fraudulently obtained and wrongfully withheld billions of dollars from the Government.

**D.    Defendants Circumvent Federal Requirements Through Lack of Oversight**

83.    Under federal regulations, a proprietary institution must meet certain requirements regarding the programs offered and instructional time and provide training that prepares a student for "gainful employment in a recognized occupation." 34 CFR 668.8(d).

84.    In the Spring of 2015, when Relator Ellis questioned Defendant UOP's administrators regarding reduced class hours and abolishment of Learning Team requirements in other States, Ed Zevin, Department Chair at the Jersey City campus indicated to Relator Ellis that the other campuses would just add more assignments and homework.

85.    UOP has no controls to ensure compliance or oversight with the federal regulations which govern FSA program eligibility requirements. 34 CFR 668.8(d) and (l)(2).

86.    Moreover, in Relator Ellis's experience at UOP, from the quality of the assignments, students likely spent on average of one hour per week on assignments outside the classroom.

87.    Despite its continued failure to comply with state and federal law, and its PPA with the Government, Defendant UOP re-certifies each year that it is in compliance.

88.    As a result of this conduct, Relators believe that Defendants have fraudulently obtained billions of dollars from the Government.

**E.**     **UOP Churns Applications to Students Expected to Default**

89.     UOP's completion rates are well below the required 70 percent under the eligibility standards for the federal student loan program.

90.     UOP fails to meet this threshold because it regularly admits students who cannot meet the rigors of an undergraduate degree program, even one as flexible and undemanding as UOP.

91.     UOP's primary target has always been the "working adult." This changed, however, when it realized that it could generate even greater revenues if it opened up its classroom, and its marketing efforts, to younger, recent high school graduates as well. In doing so, UOP experienced a significant increase in students that lacked discipline and suffered academically.

92.     Indeed, the admissions process was completely lacking in any legitimate standards. It was expected that UOP would admit anyone that could fill out an application. However, even that was not necessarily the case.

93.     In one instance, in or around 2006, Relator Schmidt is aware that a student was admitted that could neither read nor write. He was also personally aware that in at least one instance, an admissions recruiter actually filled out an application for a potential student because he was incapable of doing it himself.

94.     Relator Ellis on more than one occasion complained internally to UOP officials and administrators that its exceedingly low admissions standards were allowing very low quality students. His complaints were ignored.

95.     A significant volume of these poor quality students did not finish the UOP program, and should have counted against any completion rate required by the federal loan program eligibility criteria.

96.     By admitting these people, undeniably likely to default on their student loans,

UOP knew that the Government would be left with the cost of its inferior educational services.

**F.      UOP Fired Robert Ellis in Retaliation**

97.     Relator Ellis complained to UOP officers and senior administrators on numerous

occasions about the educational fraud described herein.  Each complaint was either ignored or

met with hostility.

98.     In early April, 2015, Relator Ellis wrote a letter taking issue with an article by

Tim Slottow, President of UOP, stating that UOP is a university "in every sense of the word".

99.     Approximately one week later, Relator Ellis sent a letter to Marriane Frolow,

Director of Academic Affairs, asking why his contract was not renewed.  Frolow responded by

email stating that he was fired.

100.    Relator Ellis's termination was a direct result of his internal complaints about

UOP's deficiencies as an institution and the education fraud it perpetrated on the Government.

**G.      UOP's Evasive Conduct Violates the False Claims Act**

101.    Over the course of the time period during which UOP committed the education

fraud described herein, UOP has signed several PPAs with the Government certifying

compliance with certain federal requirements and agreeing to comply with the PPAs' terms.

102.    Under Paragraph 23 of the PPA, UOP agreed that it would "meet the requirements

established pursuant to Part H of Title IV of the HEA by the Secretary, State [authorizing

bodies], and nationally recognized accrediting agencies."

103.    Part H of Title IV states, in relevant part, that "[e]ach institution of higher

education shall provide evidence to the Secretary that the institution has authority to operate

within a State at the time the institution is certified" for participating in Title IV programs.  20

U.S.C. § 1099a.

104.    UOP fraudulently induced the Government into agreeing to the PPA with UOP when it knew it had no intention of complying with the requirements for licensure in the State of New Jersey.

105.    Further, UOP's knowing and intentional violations of the New Jersey instructional time requirements through deceit and false pretenses violated the PPA.

106.    Additionally, to date, UOP continued to admit students who do not meet any elementary standards for admission knowing that the Government will be forced to take the loss when these students inevitably default on their loans.  This open admissions policy has caused UOP's completion rate to drop far below that which is required under the federal eligibility standards.

107.    As a result of this improper and fraudulent conduct, UOP violated the FCA and should have been disqualified from the federal student aid program

108.    UOP's violations of the FCA have caused the Government billions of dollars in damages.

## CLAIMS FOR RELIEF

### COUNT I
### False Claims Act: Presentation of False Claims
### 31 U.S.C. § 3729(a)(1)(A)

109.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

110.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants have "knowingly present[ed], or cause[d] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the

United States a false or fraudulent claim for payment or approval" in violation of 31 U.S.C. §
3729(a)(1).

111.    As a result of Defendants' acts, the United States has been damaged, and
continues to be damaged, in a substantial amount to be determined at trial, and the United States
is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729
arising from Defendants' unlawful conduct as described herein.

**COUNT II**
**False Claims Act: Making or Using A False Record**
**or Statement to Cause Claim to be Paid 31 U.S.C. § 3729(a)(2)**

112.    Relators repeat and incorporate by reference the allegations above as if fully
contained herein.

113.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts
alleged herein, the Defendants have "knowingly ma[de], use[d], or cause[d] to be made or used,
a false record or statement – *i.e.*, the false certifications and representations made or caused to be
made by the defendants – to get a false or fraudulent claim paid or approved by the Government"
in violation of 31 U.S.C. § 3729(a)(2).

114.    As a result of Defendants' acts, the United States has been damaged, and
continues to be damaged, in a substantial amount to be determined at trial, and the United States
is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729
arising from Defendants' unlawful conduct as described herein.

**COUNT III**
**False Claims Act: Retaining Overpayment 31 U.S.C. § 3729(a)(1)(G)**

115.    Relators repeat and incorporate by reference the allegations above as if fully
contained herein.

23

116.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowing conceal[ed] or knowingly and improperly avoid[ed] or decrease[d] an obligation to pay or transmit money or property to the Government" in violation of 31 U.S.C. § 3729(a)(1).

117.    As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT IV
## RETALIATION (31 U.S.C. § 3730(h))

118.    Relators repeat and incorporate by reference the allegations above as if fully contained herein.

119.    By virtue of the acts alleged herein, Defendants threatened, harassed, and/or dismissed, and/or discriminated against, Relator Ellis in the terms and conditions of his employment after he lawfully reported what he believed to be fraudulent conduct or wrongdoing to his superiors and corporate representatives in violation of 31 U.S.C. § 3730(h).

120.    Relator Ellis seeks compensatory damages and other appropriate statutory relief pursuant to this section.

## PRAYER FOR RELIEF

WHEREFORE, for each of these claims, the Qui Tam Plaintiffs request the following relief from each of the Defendants, jointly and severally, as to the federal claims:

24

a.      Three times the amount of damages that the Government sustained because of the acts of Defendants;

b.      A civil penalty of $11,000 for each violation;

c.      An award to the Qui Tam Plaintiffs for collecting the civil penalties and damages;

d.      Award of an amount for reasonable expenses necessarily incurred;

e.      Award of the Qui Tam Plaintiffs' reasonable attorneys' fees and costs;

f.      Interest;

g.      Such relief as is appropriate under the provisions of 31 U.S.C. § 3730(h) of the False Claims Act for retaliatory discharge, including: (1) two times the amount of back pay with appropriate interest; (2) compensation for special damages sustained by Relator Ellis in an amount to be determined at trial; (3) litigation costs and reasonable attorneys' fees; (4) such punitive damages as may be awarded under applicable law; and (5) reasonable attorneys' fees and litigation costs in connection with Relator's Section (h) claim;

h.      Such further relief as the Court deems just.

## DEMAND FOR JURY TRIAL

Relators hereby demand trial by jury.

Dated: October 19, 2015

Respectfully submitted,

SMITH & SMITH, PLLC

By: _____
     Grant Cartwright
6720 East Camino Principal
Ste 203
Tucson, AZ 85715
Tel: 520-722-1605
Fax: 520-722-9096
grant@smithandsmithpllc.com


David S. Stone (pro hac vice to be filed)
David B. Harrison (pro hac vice to be filed)
Danielle F. Moriber (pro hac vice to be filed)
STONE & MAGNANINI LLP
100 Connell Dr. Ste. 2200
Berkeley Heights, NJ 07922
Tel.:   (973) 218-1111
Fax:   (973) 218-1106
dstone@stonemagnalaw.com
dharrison@stonemagnalaw.com
dmoriber@stonemagnalaw.com

*Attorneys for Plaintiff-Relator*